Please rise. The Senate will call the Court of Appeal. The Judicial District of the State of Illinois is now in session. The Senate will address Ms. Mary Kay O'Brien. Please be seated. Clerk, call the first case, please. 3-14-30, People of the State of Illinois, Appellee by Justin Pelosi v. Shemontae Crowder, appellant by Jay Wigman. Mr. Wigman, good morning. Good morning. Good morning. May it please the Court, Counsel. I am Jay Wigman, an Assistant Appellate Defender with the Office of the State Appellate Defender, Counsel for Defendant Appellant Shemontae Crowder, who requests that this Court reverse and remand his cause for a new trial for the following two reasons. First, the trial counsel failed to ensure that videos of his interrogation by the police were redacted to exclude a. the officer's personal opinions of defendant's guilt, and b. hearsay statements that included statements by multiple, often unnamed sources who identified the defendant as the offender, including statements that indicated that the defendant had gang ties, and again were hearsay. Secondly, because the recording of the defendant's friend's statement was inadmissible for either impeachment purposes or for substantive purposes, where the witness stated only that he did not remember making the statement and his testimony did no affirmative damage to the State's case. To put the significance of the videos into perspective, I'd like to point out that the State's case took essentially two and a half days to try. The State presented a number of witnesses over that two and a half day period, and included within that are the opening statements, closing arguments, the testimony of a defense witness that was taken out of order, the testimony of a State witness that was eventually stricken. So I'm assuming that with all that time, we're looking at roughly 15 hours of testimony that was put on before the jury. Of that, two and a half hours was the interview of the police of the defendant. So roughly 16 to 20% of the State's case was this video, and it's significant in its impact and the impact that it had on the jury. In large part because of the size of it, and in part because if you took away the testimony of the police officers, five or six of whom basically simply testified that they weren't able to find bullets on the scene or cartridges, and what you have is the defendant's testimony through the video. You have the videotape and the officer's testimony through the videotape, and you have the identification witnesses. And notably, the first 35 minutes of this two and a half hours of video consisted of the police speaking with the defendant about things other than the instant offense. The actual charge, the reason they were there, was not brought up despite the defendant asking for the first 35 minutes, or roughly 20% of the interview. It's also important to note that this did not include an admission by the defendant. And it wasn't a video where, for instance, the police needed to show that they hadn't browbeaten the defendant, that it was voluntary, or explain how it was that the defendant came to implicate himself in the offense. There was never an admission throughout all of this. Repeated statements by the officers that the defendant was not credible, that he was a liar by nature, as was brought up at the very conclusion of the interview. Not something that was used to set a flow, or to push the defendant in a certain way, or to show how the statement changed. But at the end, just a bald statement that he was a liar by nature, hadn't said a true thing the entire day. Throughout all of this, then keep in mind that what we have now is the statement of the defendant, through the videotape, versus the identification. And throughout all of that, not only are the officers stating that they don't believe the defendant, but they're vouching for the credibility of the people that they've spoken to. So you have hearsay statements, and as a third matter, the fact that the police, through those, are vouching for the unknown witnesses, saying that they're credible. Saying that these statements were separate, not made together, and yet, nonetheless, were consistent. So the police are laying the foundation for a credibility contest, which is notable in a circumstance where it is not the defendant's credibility that should be at issue. The defendant doesn't have to prove his innocence. Instead, that's the state's burden, and the police were doing it through this video. There was also an admission of gang evidence. The officer said, we have Facebook pictures, and they open a file and they show to the defendant pictures. The jury never sees those. So now we're invading the province of the jury, the opportunity to weigh the credibility and to see what the picture says. The defendant says, that's just me giving the middle finger to somebody. The officer says, no, no, that is not. Those are gang signs. You're flashing gang signs. You're representing that you're from the east side. That is in no way simply a middle finger. The jury doesn't get to see that. So it's having to take the officer's word, and again, the jury has declined the opportunity to weigh the evidence itself, and the province of the jury is interfered with. So we have the officer showcasing their own case, entering hearsay of the defendant's mother, his uncle, his buddies they refer to him at one point, his friends, people who don't know him, they said, but who are credible. In that fashion, they're vouching for the witnesses who are the other part of the state's case. Gang evidence is admitted. Can you cross-examine a videotape? You cannot. But we don't even know who the witnesses were, and they weren't present, and that was one of the things that allowed for such evidence to be presented through TICE, a case cited by the state, which is that the officers, for instance, were subject to cross-examination, but the defendant's mother wasn't subject to cross-examination. There was no way to determine or to test the case that was presented by the state through the videotape. The tape also served to put a gun in the defendant's hand, in the jury's mind, through Officer Schumacher stating that there were at least two people who said that they had seen the defendant holding a gun just a week before, and this is separate in part from James Hayden's statement, and we'll talk about that in a minute, but through these other two witnesses... That was a longer time period. That was a longer time period. He said something like several months, and one thing to note about that is that that would have made it something that he did when he was a juvenile, thus demonstrating the greater significance of that offense and that allegation. But a few weeks before, Schumacher said that Bryson and Oscar, neither of whom testified at trial, saw the defendant holding a gun, and again, this is prejudicial evidence that gets sent to the jury before the defendant even steps onto the stand. All of this was extremely prejudicial to the defendant, in large part because the state then replayed these tapes during closing arguments. But the greatest impact is that this hearsay evidence, in particular, bolsters the statements, bolsters the identification evidence, which was rather weak in this case, and it can't be said that had this evidence not been presented, that there wouldn't have been a reasonable chance that the outcome in this case would have been different. So... How can you say the identification evidence is weak? Well, in large part because of the nature of the identification evidence, in large part because this occurred at night about a week before Halloween. So we're talking 7.30, 8 o'clock at night at a time when it's dark. In an offense that happened with just seconds, and under circumstances where people were running, at least two of the witnesses stated that they had never been that scared in their life. One who said that she had been able to focus on the defendant for up to, I believe, 10 seconds, told the police beforehand that she had spent most of the time hiding behind a tree, and that she really hadn't seen anything. And in her initial statement, she said that she couldn't identify the defendant. Several of them said that they knew him. Several said that they knew him from around the area, and the thing is that one of the factors that's used, and obviously that's one of them, but another one of the five factors, is whether the description is accurate. And there wasn't a description, truly, that was given. What was said was it was Mugillo. The name was given right away. But there wasn't a description for a comparison. And the description would have noted a couple of things, and I'll take that back for a moment. There was a description that he was short. The DOC lists him as being 5'7 inches tall. I'm 5'7 3 quarters, so I like to think that that is not short. But it hardly sets forth anything for the police to look at. And if you look at the pictures that were shown, and what the primary witness, the one who was most certain of her identification, and she identified him by name, and she said that he relied upon the hair. But everybody agreed that he was wearing a hoodie, that there was little opportunity to notice the hair. There was also, if you look at the pictures, little opportunity to notice his ears, which are, I wanted to say pronounced, but it's because they're not pronounced. They're very tight to his head, and they don't compare very well to some of the other people who were included in the photo lineup. As well, one of the people in the photo lineup looked as if he was 35 years of age, or approximately twice the age of the defendant. There wasn't all that much that suggested that this was a concrete identification. And again, if you take away the pre-bolstering of the identifications, the statements by the police that these are credible witnesses, these are believable witnesses, they were consistent, they made these identifications separately, when in fact there's a suggestion that one witness made it immediately, and the other is after an ability to speak with one another at the hospital. Then further statements come out, and now people are coming forward. One of the witnesses only came forward a month later, and indicated at the time that he simply wanted his own vengeance. And another had difficulties with credibility because of the criminal records. So it's on that basis that I say that it was a weak identification. Even if you want to knock it down to a close identification, again then we have the tipping of the scales because of the statements that the police make bolstering the statements that they had been given in investigating the case. Let me ask you another question. We see cases all the time that say that there's wrongdoing if the prosecutor vouches for the credibility of a witness or bolsters the credibility of a witness. Is there a similar prohibition with regard to the police? There is not necessarily a similar prohibition, but I think that there should be, and I think that that's something that should inform this court's decision. And one of the other aspects of that that presents a concerning issue is the state's apparent indication that it's enough that this is simply on videotape, that that's all it takes. And if that becomes the rule, and if we overlook the fact that the police could then use that to vouch for a witness and in that way bolster the state's case, then I think clearly that's improper. But in terms of the officers, there's always a concern, and the jury is told, because it's recognized, that officers are going to be considered an authority figure and their word is likely to be taken with greater weight. Aren't there rules of evidence regarding whether or not you can impeach someone based on their truthfulness? You have to lay a foundation that you're going to impeach this person. You can always go to biased interests and so forth, and there are certain requirements in the law of evidence. We've adopted rules of evidence in Illinois. So this isn't something new or not discussed. I mean, there are times during trials, both civil and criminal, where people talk about a person's reputation for truthfulness. Certainly. And that still could have been achieved in this case had counsel... I think it's in the 400 series, isn't it? In the 400 series are rules of evidence. Right. Well, and certainly the tape in general terms is not inadmissible, but there were certain steps that counsel should have taken to make certain that the tape more fairly presented the defendant in terms of excluding some of these clearly improper comments. And the state could have done so without damaging the state's case. You still would have been able to see the change in the defendant's story, and you would have been able to observe his demeanor if you weren't also observing the officer's demeanor. And that took up much of the tape, and that was much of the evidence, was the statements by the officers. There's a particularly notable portion, I recall, that's at the end of the second tape or the beginning of the third, where the officers stand and speak for nearly two minutes, laying out, well, maybe it was this, and maybe this is what you did, and clearly implicating the defendant. The defendant doesn't say a word. He's not asked a question. There's no statement that he makes. And then it jumps to something else. Thank you. And so clearly there was an unfair prejudice to the defendant. While the statement may have been admissible in general terms, the prejudicial value has to be weighed against the probative value. And given that there was no statement made by the defendant in terms of an admission, clearly the prejudice outweighed the probative value. I'd like to touch on a point that Justice McDade made, and that is the body of case law that does not allow a prosecutor during closing arguments to vouch for the credibility of the state's witness. Here it says if the police officers in the videotape were giving the closing argument, normally they could put the officer on the stand and had defense counsel ask, the prosecutor ask the officer whether he thought the defendant was telling the truth or not. There would have been an objection based on relevance that the officer's opinion, that's for the jury to determine. And it should have been sustained based on the rules of evidence. But here it's kind of a circuitous way that they got around the rules of evidence and allowed the state to offer some sort of summary through the videotape in the officer's perspective. The officer clearly would not have been allowed to make many of the statements that he made on the videotape while on the stand. And you're right, it's a mechanism for the police to evade that kind of restriction. And that's one of the things. Can you touch on how the defendant testified? Because Justice Carter talked about impeaching the defendant's credibility. What was the defendant's testimony? And direct. The defendant's testimony wasn't much different from his statement. It was disjointed, the stories changed. But didn't he testify on direct? He just answered one question. He answered one question on direct. Yes. So you didn't raise an issue as to why it just seems like the cross-examination went so far beyond the scope of direct. Well, except that, as Justice Carter stated, there is an allowance for the state to, even though only one question was asked, and even though the state's questions didn't go to that question, the state is allowed to impeach by exploring the defendant's veracity and his credibility and judging his statement against other factors and bringing up the contradictory statements that were made throughout. But it also highlights, I guess, a couple of concerns. One is, had the entirety of that tape not been admitted in the state's to whether the defendant would have chosen to testify in an attempt, though perhaps failed, to clarify or to explain the statements that were presented by the police. The second thing is that it essentially gave three opportunities for the defendant's statements to be presented. The initial statement that was presented by the police, the defendant's testimony, and then the use of, I believe it was, five sections of tape in it. And unfortunately, the record is unclear as to what was on those portions of the tapes. But there were five, two of which were at least apparently five minutes long, and those were presented to the jury and relied upon heavily by the state in its case in summation. But you have not raised an issue regarding the breadth of the cross-examination. I have not. Any other questions? Thank you. Thank you, Mr. Weinberg. Mr. Nicolosi? Good morning. Good morning. May it please the Court, Counsel. Your Honors, I'm going to focus the majority of my argument on the second prong of the ineffective assistance analysis because I understand that I wrote a lot about whether or not Counsel's performance was deficient. Mr. Wigman wrote a lot that was argued here. That can be argued all day and all night, but I don't see any way how what Counsel did in this case prejudiced his client. I don't see it for a second. As Justice McDade mentioned very appropriately during Mr. Wigman's argument, the eyewitness identification in this case was not weak. It wasn't even close to weak. It was very, very strong. There were four eyewitnesses that identified this defendant as having walked up to the big group of people that were standing there and shooting the three people. Two were killed. One was not. There was no question in these identifications. Counsel testified that it was getting late and that the lighting was not good. I believe the totality of the testimony in this case was that the evidence was absolutely good enough to make these identifications. The only one who testified that the lighting was not good was Jordan Caples, who was shot and not killed. Everybody else testified the lighting was good enough. The officer testified there were two streetlights that were working in this area that night. Again, we have four strong eyewitnesses, all of which knew this defendant before the shooting. Addie Lanier had seen the defendant 20-plus times, more than 20 times before the shooting. She clearly knew who this gentleman was. She identified him in a photo lineup. Heck, she even stabbed the photo when the officer showed her the lineup. She said, this is the guy. She was so angry, but she knew this person. She didn't have to guess who this was. Tatashia Cameron, she spoke with the defendant. She knew the defendant. She knew his face. There was no question who this guy was. She identified him immediately, according to one of the officers that testified, when she was shown a photo lineup. Immediately. Geraldine Lindsey, she'd socialized with the defendant before. She saw him a lot. She knew this person just like the other two. She identified him immediately, according to the same officer, when she was shown a photo lineup. Anthony Stallings, he was the one who didn't come forward right away because he was so angry that he wanted to get revenge himself. He came forward when he realized that the defendant had been arrested. He knew the defendant as well. He had seen him a few times. These are four witnesses. When we're going over the likelihood of misidentification factors, the five factors that counsel mentioned that were discussed in the brief, all of those are in favor of the state. There isn't a single one that's in favor of a weak identification here. They all had an opportunity to view. They were all standing there. They all saw him. And it doesn't matter what chaos erupted after the shooting. That's completely irrelevant. It's after the fact. They saw this person. Because they knew him, they were able to see who this was. It didn't matter if they ran away immediately. It's easy to recognize people you know. They didn't have to. This isn't a case where they piece together, oh, he was this tall and he had this. Well, yeah, they did some of that. But, of course, in hindsight, they didn't need to. They didn't need to do any of that. Because if my dad was the shooter or something, I know him. I don't have to describe him. You're familiar with people. You can identify him by name and by nickname in this case. What's the difference? So if you go over all those factors, the degree of attention, again, how much attention, how detailed you need to be in what he's wearing, what his hair looks like, if you know him, you know him. And they clearly knew him. They identified him in court. They identified him to police in the lineup. The accuracy of the prior description, again, we don't need to talk about a description. If you know somebody, you don't have to talk about how big he is or how tall he is or what his nose looks like. It doesn't matter. And the certainty of the identification, there's no question these four eyewitnesses were very, very confident that this defendant was the shooter. The length of time, the fifth factor counsel in his brief conceded that strongly favors the state. So we have four very strong eyewitnesses in this case. And, again, we're talking about ineffective assistance of counsel here. That's what we're talking about. The substantive issues have been forfeited. So if you can't get past the prejudice prong, then counsel was not ineffective. Four strong eyewitnesses, very strong indicator that there was no prejudice here because we know who did this crime. Was there any physical evidence that corroborated the eyewitness testimony? I know the eyewitnesses agreed it was the defendant. But was there any independent physical evidence that corroborated the testimony? No, Your Honor. There were no bullet, there were no casings or anything found at the scene. But, again, there was testimony that a revolver would not leave casings at the scene. And the defendant was seen previously with the revolver before. So that's, of course, not physical evidence of the kind you're referring to with your question. But, again, Your Honor, we have strong eyewitnesses and we have a lot of them. And the people would also submit that the defendant's version of events in the videotape is also strong evidence that he doesn't have any credibility. It very much strengthens the people's case. Because in this video... What did he say in the witness stand that would give the jury reason to disbelieve his credibility, which is their word? What did the defendant say in the witness stand? One thing in particular, he says that he didn't change his story after. His first story in the tape was that he was at home all day. And then the first time he changed it, he said that he was at Shaquan Meadows' house all day. On the witness stand, he said after he told the police, the detectives, that he was at Shaquan's house all day, that he didn't change his story at all. That's what he testified to. That was a clear lie, because he clearly changed his story again on the videotape. And his third story on the tape was that he went to Shaquan's, that he went to the barbershop, that he went to Walmart, some place called The Bar. I don't know if that was the barbershop. I don't remember. But clearly he went... His first story was that he was home all day. His second story was that he was at Shaquan's all day. His third story was that he was kind of all over the place. So was he impeached in rebuttal by offering the videotape? By offering the videotape? By the state in rebuttal? See, the videotape came in during the case in chief. And that's what we're looking at. Sure. Was it ineffective assistance of counsel to open that door during the case in chief? Arguably, maybe, could have come in as proper impeachment in rebuttal. Would you speak to that issue of why the tape was relevant as part of the state's case in chief? Well, I think it was... Before the defendant testified. Well, as I argued in my brief, I think it was admissible substantively in the people's case in chief based on the precedent of the second district case that I very thoroughly discussed in my brief. I think... And in Thies, how did it come in? Say that again, Your Honor? How did it come in in Thies? The videotape. For the purposes of showing the impact of someone, right? Who was the someone on the impact? In Thies? Yeah. I think you lost me here, Your Honor. Well, how did it come in on Thies? I guess I don't know what you mean specifically how did it come in. How did the video tape get in there? I believe that was in the people's case in chief as well. Okay, but... And the purpose for doing it in that case was what? Under substantive... For substantive reasons. For... I guess I don't specifically know where you're going with this. How was it relevant? Why don't you tell me that? Well, it was relevant to show the effect on the defendant's mind. The statements in the video were relevant to explain the course of the investigation in Thies, and that's what I argued in this case as well. The course of the investigation. Yes. Correct? Yes, that's what Thies held. And now you're saying that Thies stands for the proposition that it shows for the impact on the defendant's state of mind? No. No, no. So how does it fit into this situation? I believe it's very similar to Thies, Your Honor. The course of the investigation. Well, the effect on the listener's mind. I'm obviously getting confused here, but... Now, who's the listener to you? The defendant in this case. Okay. Yeah. So the effect on the listener's mind. Absolutely. That's what I asked you before. You're saying it's for the impact on the defendant? These specific statements from the detectives in the video? Yeah. Yes. Yes, because the defendant only changed his story when faced with these statements from the detectives. He was standing by his story the whole time, and then the detectives said, well, we talked to Shaquan, we talked to James Hayden, we talked to your mom, and they say otherwise, according to, you know, different denouncement. How is that part of the course of an investigation? Exception? You're right. In the same way that it was in FICE. I don't know how to say it any better than that. In their case, they enticed it was about an investigation. Right? Their course in the investigation. Okay. Isn't that right? Yes. Yes. Okay. Is this about the police course in an investigation? I would argue it's probably more along the lines of to show his state of mind as why he changed his story, why he flipped flops so often during the investigation. And there's no law like that, is there? What do you mean? There's no law that says you can, you know, we've had a long exception in the Illinois law of evidence for some things being admitted to show why the police took the next step or the course of their investigation. Sure. And it's been criticized many times, but it's been around for a long time. Okay. This appears to be very different. This is introducing impeachment of prior inconsistent statements. Right? Changing your story. Sure. And there's a way to do that, isn't there? Yes. Okay. That would be under 613, 613B, prior inconsistent statements. Okay. But that presumes the testimony of the witness preceding the introduction of prior inconsistent statements. I believe. I mean, that's exactly correct. You can't be impeached with prior statements. You can be impeached with prior statements, but you have to give a statement first under O. Of course. Of course. So now you can say you don't remember and you're allowed to impeach for that. Sure. And, you know, that allows a lot of impeachment. But here, the defendant took the stand. Okay. So if you're saying this was showing the inconsistency of the multiple stories given by the defendant, how does this fit into the 613 inconsistent statement case law that we have? I'm going to go even broader than that, Your Honor. There was no objection to the entire statement being admitted. And, again, this videotape was redacted beforehand because counsel found things that he didn't like, so it was redacted. They agreed to that. And then there was no objection to the rest of this tape being admitted in the people's case in chief. Again, I think we constantly need to go back to ineffective assistance of counsel here. And counsel didn't object to that. And so, therefore, it was admitted for, again, whatever purpose necessary. If there's no objection, it's just evidence that is admitted for the jury. Isn't one of the issues before us whether this failure to do that was ineffective assistance? Sure, Your Honor. But, again, there's two prongs. Deficient performance is obviously hairy, and we can talk about that all day. But I'm going to keep pulling Your Honors back to the prejudice because that is just as important as whether or not his performance in allowing these statements and opinions and arguable hearsay in front of the jury. Prejudice is just as important a prong, and the defendant can't meet it here. There was no prejudice. There were four strong eyewitnesses. I thought that you were arguing that videotapes such as this should always come in in the state's case in chief where a defendant gives different versions of the events because that opens a pretty wide door. I understand that, Your Honor. Basically, I'm just piggybacking on Thies and Griffin. This is part of the problem I have. I feel like I cite fewer cases in my briefs than most people do because I feel like you can always nitpick. You can always say they're similar and dissimilar, and the defendant can do the other side. But I find the closest case to as analogous as I can, and I argue it as best as I can whether or not the facts meet that particular case or not sometimes. And that's what you need to do as an appellate advocate. We're not criticizing that. I'm just trying to understand your argument. So let's say that counsel wasn't ineffective for letting this come in without more editing. You're saying the prejudice isn't there if it was ineffective. Let me back up. Sure. You're saying even if it was ineffective, the prejudice isn't there. Absolutely. And so we have to look at the statements to decide if the prejudice is there. If they impacted this case at all. So you don't think the officer's speech about you're not telling the truth didn't negate the strong eyewitness testimony? I don't see how they negated it. Again, if you go on F.E.A.S.T., the detective there said very similar things to that defendant, that he wasn't telling the truth. Here's the statements from other individuals, the victim in that case and another person in that case who said basically, the detective said I have the detective in these statements right here saying that what Valerie is telling me, and you're telling me nothing happened. And then he says that the victim was honest with the detective there about what happened. So I feel like there's some similarities there. Again, if they were to admit it here. What do you think about the gang member reference and the impact it might have on the jury? I think that was very minor, Your Honor. It wasn't a huge part of this case. It wasn't mentioned in closing. It wasn't mentioned in rebuttal. There was no witness that testified that he was a gang member. The defendant never admitted it. The detectives just mentioned it, I would argue, fairly in passing because it wasn't, again, it wasn't an issue that was thoroughly cultivated. And again, there was no admission that he was a gang member. Quite simply, I don't think there was no evidence that he was a gang member. And I think, again, it was brought up. Why was it brought up? That's a good question. I don't remember. Maybe they were just trying to get an admission from him that he was a gang member on the tape, but he didn't give them that admission. There's no solid, there's no admission that he was. I have another, an additional concern about the videotape in general. Do you agree that this was about three hours? That sounds about right, if I remember correctly. And it was at the beginning of the trial? Yeah, I think so. And we have a lot of case law that says that the police are not required to be truthful when they're interrogating witnesses. They can make up anything that they want to make up. And it strikes me that we're getting a lot of stuff coming in on these videos that really is not credible in and of itself because of the latitude that we allow the police to have when they're questioning witnesses. So there's a lot of stuff coming in that maybe totally false, and yet it's coming in in an uncritical kind of way, and it's helping to build the state's case without any basis for believing that any or all of it is truthful. Sure, Your Honor. I can't necessarily disagree with that. All I can say is that the defendant has an attorney as well, and it's his attorney's job to, again, weed out what he believes is inadmissible, raise those objections. But we have different levels of jurisprudence here, I guess. I don't know if that's the right word, but it's gotten to this point, and the counsel has raised the issue of trial counsel's ineffectiveness, and we have an analysis that we go through. I understand there's a much bigger picture question that I'm unfortunately powerless to change what is happening below, but all I can argue is this case at this particular time and whether or not this particular trial counsel was ineffective for allowing this particular tape to get in at this particular time. And I'm sorry, I still very strongly believe that counsel wasn't ineffective because I don't believe with the complete lack of credibility from this defendant and the strong eyewitnesses that there was just no prejudice here. Whatever happened in the tape, I don't see how it affected the actual testimony that was given in this case. Essentially, the strong point you want to argue is the lack of prejudice. Sure. And you're saying there's a lack of prejudice because the defendant could be determined to be just not credible? I feel like that's part of it. And why would the defendant not be credible at all because of the multiple inconsistent stories? Because of the complete mess that was his interview, the stories that he gave to the detectives, yes. And if that aspect was improperly admitted into evidence, what does that do to your prejudice argument? Your Honor, I don't believe the entire statement was improper. Again, there's no argument here that the tape shouldn't have been admitted. There's no argument there. We're talking about specific statements that occurred within the tape. I have not heard the argument that the tape should not have been admitted, period. The statements that were objected to were statements allegedly about the defendant, right? Well, from the, yeah, sure. But again, we also have the defendant's words. We have the defendant's statements. There's no claim that any of those should have been stricken. His story, which, again, it was 100%- The story is coming from the videotape. From the defendant on the videotape. His own words were not, counsel has not argued that any of the defendant's statements should have been eliminated from this tape. And again, if you go even broader, he's not saying that this tape shouldn't have been admitted. You agree, do you not, that statements on a videotape are hearsay unless it's a hearsay exception or it comes in for some other reason? Sure, except not the defendant's statements. Those are admissible. As what? Those are hearsay exceptions. Oh, you're right. Has that not been established, that the defendant's statements on a videotape are admissible? Well, it has to come in for some other reason. What exceptions are you talking about? Well, is that not a- I mean- That's a question I wasn't assuming. I thought that was well settled. I guess maybe I'm wrong. I'm not trying to put you on the spot. I'm saying that before things can come in, because evidence is about what comes in and what stays out. Sure. Okay. So before things can come in, and so you've got statements on a videotape made by a defendant. Yes. Okay. So when can things, earlier statements made by a defendant, come in? And there are different ways to do that. For example, there's prior testimony under oath, and then it can come in as substantive evidence. There are other examples where it comes in not as substantive evidence, but as impeachment under our law, not federal. Federal is different. Okay. And so, again, I'm not trying to put you on the spot, but in this case and the way this all came about, it just strikes me as very curious from the standpoint of the law of evidence. Sure. All across the state. I do agree that a critical issue in this case is this otherwise prejudicial, because this wasn't raised below, so they have to find an ineffective assistance counsel. Yeah. So does the four eyewitness testimony that you pointed out when you started your argument here, which your statement is that it's very strong, no doubts, the testimony of who this person was. Absolutely. And that would, so to speak, trump anything else, because it was so overwhelming that all this other stuff really doesn't impact the fact of guilt. That's my argument, yes. So then the question for us is, if there was error in attacking the credibility because of all the inconsistencies of the defendant's versions of the facts as set forth, not from witnesses on the stand or not through these videotapes, if that was error, does that play into how solid the case against the defendant, does it make it harmless or not? Or plain error or not? Your Honor, I think specifically talking about this case, defendant wants, he wanted counsel, trial counsel, to have had redacted certain, lots of statements made by the detectives and not the defendant. I think the defendant would probably concede that he would have been okay and they would have been okay if just the defendant's statements and not anything from the detectives were admitted on this video. That's the impression I'm getting because I have no evidence to the contrary. If the defendant's, and only the defendant's statements in the video, let's say the video was edited so it's just the defendant's statements back-to-back-to-back, I don't see how there would have been any objection to that in this case. Counsel, you have one minute. Thank you. So therefore, if his statements would have been admitted anyway, I guess is the inartful way of saying this. See, that's the reason of my earlier question. How would they have been admitted anyway under what rules? I'm not trying to put you on the spot because that's not, you're responding to the argument they make. I understand that. Sure. They're arguing about evidence, but they don't talk about all the rules of evidence. And so I'm not trying to put you on the spot. I'll ask him some of those questions. Well, and I guess in the context of this case, I would argue that there was no objection to this tape in its entirety being stricken because that's not an issue. I feel like I'm talking about the entirety. I'm talking about the statements they complain of, the statements that are complained of. Sure. How did they come in? And under what rules of evidence are they coming in? Are they coming in as substantive evidence or as just for appeasement purposes? And what rules are we talking about to get that in? It appears that the trial started, the state put on their case in chief, and you've got all this videotape information coming in. Sure. And I'm not saying the whole videotape strike. I'm just saying when they're complaining about certain statements coming in and certain things coming in, how did they come in? Because videotapes are hearsay. It's not their trial. I mean, we're not even talking about confrontation issues because maybe they don't exist if they're allowed to come in. Sure. Okay, if those statements are allowed to come in. So if there's a problem, then we've got facing each other is you've got the overwhelming evidence of four witnesses and you've got the impact of information coming in about prior statements. And if that was error, what does that say about the trial? I think, yes, Your Honor, that's the decision that Your Honors are going to have to come to. It's the evidence of the eyewitnesses counteract whatever harmful effects you think that the videotape had in this case. That's entirely your purview. Again, all I can do is argue the position that I have. I mean, you're stuck with the facts. Sure, sure. I seem to be stuck with a lot of facts when I walk up to this podium. Unfortunately, I can't change the facts, not that I want to. You're stuck with what happened. Sure, I'm stuck with what happened. My opinion on whether everything was handled below is, of course, irrelevant here and not overly helpful. No, it's relevant. Can it fit into a justification? And I understand your primary justification is the longstanding principle that investigatory steps can come in on hearsay. Sure. And the question, again, I'm not trying to put you on the spot, is that's true for investigatory steps, but it appears that in this case what was coming in was really a tax on the credibility of the defendant. That's different. I understand. I think, again, not to pull you back to Thies again, Thies and Griffin, I feel like those cases muddy the water on this issue a little bit because that case I thought was very plain and very blunt that recordings are not hearsay as long as they're authenticated and provided a proper foundation. And, again, the reason I compared this case so thoroughly to Thies is because I thought there were so many similarities. And they admitted the detective in that case had very, he commented on the defendant's credibility. He provided some quote, unquote, hearsay from other witnesses in that case in this video that was admitted, and the appellate court affirmed the admission of that. And so I don't want to pull back. You know, I have a problem with that because I would beg to differ with you on that overreaching analysis that videotapes can fly at. Videotapes are generally, it's like prior testimony. There are exceptions. You know, we have a statute, we have a rule of evidence. Sure. That prior testimony subject to cross-examination comes in as subject of evidence. And you've got the recording at the trial or you've got the transcript from the trial that flies into evidence. Sure, sure. That's one example of something like that. Yeah. But generally what's said in a videotape is not subject to cross-examination. True. And, you know, like at the trial you're putting it in. Yeah. And it's prior statements. And if they're coming in for the truth of what's stated, it's classic hearsay. Right. So then you're looking for what are the exceptions out there to fit that in. How does it come in? Either substantively or for impeachment. Sure, sure. So it's one of those things. It's what box do you fit it in? Yeah, yeah, yeah. And if it doesn't fit any box, then counsel probably should have been a little more strenuous in objecting and keeping certain things out. But again, not to go back to my original starting point, but I'm going to go back to my original starting point. Is this prejudice? I've got one last question for you. Okay. What about Hayden? How about let's go to prejudice again? That's the only thing that's highlighted under my second issue. So let's go to prejudice again. I feel like the evidence was really strong other than the deficiencies perhaps of this tape. And again, the substance of that was forfeited as well. Counsel abandoned that issue post-trial. But under the prejudice prong, the pillar of justice in this state, the prejudice prong of the ineffective assistance of counsel analysis that the people would submit that this court should affirm the findings below. Thank you. Thank you. Thank you. Mr. Weidman, are you available? I do want to get to Hayden eventually since I didn't get to it earlier and since the question came up. But first I want to address a couple of points that were discussed here a few moments ago. One is regarding the gang evidence. And while Mr. Nicolosi is correct in terms of it having been a small part of the trial, the impact of gang evidence is huge. And it has been noted by courts the difficulty that jurors have when faced with gang issues and the impact that it has upon them. And the mere fact that he is apparently flashing gang signs, or at least according to the police, is flashing gang signs, is something that's going to prejudice the defendant in the eyes of the jury. And as Justice McDade noticed, the police absolutely can lie while interviewing a defendant. And there's nothing to prevent that from being used during the interview. But it's not something that then should be allowed to be presented to the jury. And that's the concern that we have here. In turning to a discussion of, and I hope I'm pronouncing it right, Tice is how I would have, Tice is somewhat notable for the differences between that case and this. While it was represented that there were hearsay statements made by the jury, there are two statements where the detective says, well, I spoke with her and she was honest with me. But he doesn't say what that statement was. And, well, of course, she gave me her version and that's why we're here. But there wasn't a repeat of what it was that the other witnesses said. Here we're dealing with a lot of double hearsay. And that's the concern. Beyond what the officer says, and that's objectionable for different reasons as to his opinions, what the officer says other people said is something that the defendant can't confront. He can't challenge. And it serves to bolster the statements then that are made on the witness stand where they, in fact, can be challenged. And that's one of the great concerns that we're dealing with in this case. And one of the differences between this case and Tice. And while there was a course of investigation to be shown and the impact on the listener, and I mentioned that in my opening argument that there are times when the police are trying to show, well, we pushed this way and this is what the statement led to. That didn't happen in this case. There was no revision by the defendant in terms of whether he had committed the offense or not. Whereas in Tice, it was a sexual abuse charge. And the defendant, there was a suggestion of, well, you know, did you ever change a diaper? And that was odd because there wasn't a question first about changing the diaper. And the defendant brought that up somewhat defensively. And the detective went with that then to say, well, you know, maybe this happened when you were changing a diaper. Well, yeah, maybe it did. Maybe I accidentally touched him or pinched him while I was changing the diaper. Then did that lead to anything else? Well, at that point, the defendant stopped. But it shows that there was an impact on the listener and that there was a change and an evolution, not just of the investigation but of the statement that was made. And that's a large part of the reason that Tice allowed that statement in. But again, it wasn't, as in this case, replete with double hearsay. And it wasn't something in this case where there was that sort of change in the statement that was made. In large part, I think the answer to the question of how did this get in is because counsel let it. Counsel didn't challenge the statements that were made in general terms. And that happened in Tice as well. It was noted in Tice that there was no objection to the admission of the statement. At least here, there was an initial objection by counsel and then an argument regarding the, you know, what of those things should be gotten into. And it's frustrating that counsel took it to one step but then walked away. And what it was that was excluded, we don't know. What we do know is the great extent of a large variety of things that were gotten into evidence simply because counsel didn't at least try to have the tape redacted. And there are large portions that needed to be redacted. Thank you. When you say he didn't try, you mean he withdrew the motion and said that he was going to reach an agreement? He withdrew the motion. He was going to reach an agreement. And another example of that as well, and I realize I'm shifting course, but he, you know, another instance of his ineffectiveness was that he raised the issue regarding Hayden's tape in his motion for new trial and then withdrew it saying, well, there's no merit to that argument. Whereas this court has said that there is merit to that argument. Let me understand your argument as to prejudice, focusing on Mr. Nicolosi's views. Are you attaching two labels to the prejudice, that there's a credibility problem and then there's a gain problem? The prejudice is that, well, it's somewhat five-fold. The larger concern is the vouching for the witnesses and the bolstering of their testimony in this credibility battle. And largely it does go to the credibility of the defendant as the officers say, these people were credible, they were consistent, they told their stories separately. It gilds the lily, it lays the foundation then when the witnesses actually come in. The other thing is there's a suggestion that there were a whole host of other witnesses. We don't know what the number was that the detectives were saying. There are other witnesses who say. So how does that prejudice the defendant? Does it prejudice him in terms of the jury wouldn't find him credible when he testified? It prejudices him in terms of, in a close case where it's a question of the credibility of the eyewitnesses versus the defendant. It's a credibility question, but it's also a tipping of the scales by saying, these are credible witnesses and vouching for them in advance. Had that not been there, then there are significant questions about the application. Because when the defendant was cross-examined, he did admit that he had lied. Yes. So going to prejudice, I'm wondering, certainly there's a lot of things on that videotape that show the defendant wasn't necessarily a believable person, but even he admitted he wasn't believable. So I'm just wondering what your thoughts are. My thought is that it primarily rests with the credibility enhancement that was provided to the other eyewitnesses in terms of what they saw and their ability to see. Thank you for answering my question. You're saying the enhancement because of the statements on the videotape? Right. But there weren't statements about the eyewitnesses, were there? There were statements about the eyewitnesses. There were several where the detective said that at one point, I believe, Detective Matlock said, these are credible witnesses. That's right. Okay, yeah. These are believable witnesses and they saw it. You know, on the Hayden matter, you know, isn't when, and I'll use the quote, the motherfucker's dead, the motherfucker's gone, and you say that that would be improper, but that really is, it's a statement of what was said, right? It was a statement and the person has personal knowledge that that was said. The import is it was said. But the case law says that the personal knowledge applies to the events that happened, not the statement that was made. It's, I don't want to say akin to double hearsay, but whether the statement was made or not is not the personal knowledge that the rule requires. But here it's about what's keyed in on is the statement made by the defendant, right? Well, I see it different as, you know, I understand there's other case law that you can't point to things that you don't have personal knowledge of. But here he has personal knowledge, this defendant said this. But he doesn't have personal knowledge that the people were dead. I know, but the defendant said that and that's what it's coming in for, the defendant's statement. And he has personal knowledge that the statement was made, that that verbal act was made. It was a verbal act. It was a statement made. It's coming in for the statement made. Now, not about describing events. It's just that this defendant says these words. And that's how it's coming in. To that extent, that's how it gets in. But to the extent that the rule calls for it to be his personal knowledge of the event rather than the statement. Well, see, the event here is the statement is made. That's the event. Or is it that there was, in fact, a murder that occurred? No, no, it's the fact that the defendant made the statement. That's the event that we're talking about in this case. It's different from some of the other case law where you have to be, you know, it's absolutely true. You have to be personally aware of what the situation is, the circumstances, okay, before you can testify. This witness was aware that this statement was made. Now, if I may ask, are you discussing this then in terms of impeachment or as a substantive matter? That is a substantive matter. The defendant said these matters. The defendant said this. And it was coming in for the, you know, in the trial against this defendant. Right. Okay? And with regard to the gang signs, Illinois law on gang signs has been very broad for a very long time, has a lot of things in that fly in, you know, this kind of event, a suspicion that it was gang related or something. And part of the difficulty is we don't actually know what the sign was. They apparently had a picture, but it wasn't entered into evidence. It wasn't shown on the video. We don't know. And, you know, there's case after case dealing with all kinds of situations where a gang, you know, using a gang sign that's flown in, coming in in trials about criminal activity. And maybe if we actually knew it was a gang sign, then that might be more sufficient. But I would also note that gang evidence was excluded because the state was unable to make its foundation. And they brought in a sergeant to testify as to the defendants. And that was kept out. It wasn't kept out. The judge said don't consider it after it was given. I don't know that the sergeant necessarily got into tying the defendant to the gang. They put him up to establish a foundation, and then there was an objection before the evidence really got into anything. And they discovered that they did not have a witness who could identify the defendant as being in a gang. There was gang evidence to the extent of this is what there is within the community, but it wasn't tied to the defendant because Furtute essentially withdrew as a witness. And what did the judge say to the jury about disregarding Sergeant Gavin's testimony? I believe that he said to disregard evidence regarding gangs. I'm making the distinction that there was nothing to tie the defendant to gang activity. And then we have this video coming in where they say there's a picture of you participating in a gang. But they weren't supposed to consider the gang evidence, and except for that there was nothing to tie him to any sort of gang activity. Then I thank the Court. The four witnesses were pretty strong, weren't they? There were a lot of difficulties with the four witnesses, and several of them initially said that they couldn't identify the defendant. Well, one was frightened. One was threatened. Well, I think they were all frightened, and she said threatened, but that was within the two hours after the shooting, and I'm not sure that the threats had generated by that time or where the threats came from. With the one witness who waited 30 days or more to come forward, you would understand that by that point there are threats that are made. But there was nothing to indicate, certainly nobody indicated that the defendant had made any threats, and if the defendant as the shooter was acting alone, then I don't understand how it is that within that time period there was a threat that could be made. All were understandably scared, and the sister was obviously understandably emotional. But much of that came from grief over her dead brother, and this certainty in her mind that it was Moogjilla who she didn't describe. She didn't say, here's who you're looking for. She simply identified him by name, and then others who hadn't been able to identify him earlier came forward with the same. It was all based on the hair, which doesn't appear to have been the hair that he had, certainly upon arrest or even before that, according to other testimony. There were certainly enough weaknesses within the identification testimony that had they not been improperly vouched for, and had there not been other improper evidence, there would have been a reasonable probability that the outcome would have been different at trial. And therefore, we ask that this matter be reversed and remanded. Any other questions? Thank you, Mr. Weinman. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand at recess for a panel statement. Please rise. This court stands at recess.